# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ERNEST BAKER,

                                :

           Petitioner,                       Case No. 1:10-cv-796

                                :          District Judge Michael R. Barrett
     -vs-                                     Magistrate Judge Michael R. Merz

WARDEN, Chillicothe Correctional
  Institution,

                                :

           Respondent.

## REPORT AND RECOMMENDATIONS

Petitioner Ernest Baker brought this habeas corpus action *pro se* pursuant to 28 U.S.C. § 2254 to obtain release from the imprisonment sentence he is serving in Respondent's custody.  On Judge Litkovitz's Order (Doc. No. 2), Respondent has filed a Return of Writ (Doc. No. 8) and Petitioner has filed a Reply (Doc. No. 9).  The case is therefore ripe for decision.

## Procedural History

Baker was indicted by the Hamilton County Grand Jury in Case No. B-0701835 on four counts of theft, one count of theft of a motor vehicle, one count of forgery, and one count of passing bad checks.  In Case No. B-0706253 he was indicted on one count of forgery, one count of theft of a motor vehicle, one count of theft, and one count of tampering with records.  Over Baker's objection, the two cases were joined for trial and a jury convicted him of all counts in the first

indictment except count one, but only on the tampering with records charge in the second indictment.  He was sentenced to an aggregate term of imprisonment of eight years.

On direct appeal, the Hamilton County Court of Appeals affirmed as to all counts except for the passing bad checks charge, on which an acquittal was ordered, reducing the sentence to seven years.  *State v. Baker*, 2009 Ohio 4188, 2009 Ohio App. LEXIS 3574 (Ohio App. 1st Dist. Aug. 21, 2009).  Baker attempted an appeal to the Ohio Supreme Court, but that court declined jurisdiction. Baker then filed the instant Petition, raising the following Grounds for Relief.

> Ground One: Warrant, no probable cause. See Memorandum, The detective admitted in testimony she knew the allegedly stolen car legally already belonged to Mr. Baker before she applied for a warrant on it.
>
> Ground Two: Arrest was illegal. See memorandum. The same detective arrested Mr. Baker outside her county jurisdiction without the assistance of local law enforcement. See Memorandum.
>
> Ground Three: Was arrested, charged and convicted for civil matters, some were as Mr. Baker wasn't even in default of Count 3. Mr. Baker showed he had satisfied the debt in Counts 2 and 4.
>
> Ground Four: Release from joinder. See memorandum and Exhibit "GGG" Along with other issues address in the memorandums and all motions and briefs.

(Transcribed from the handwritten Petition in the Return of Writ, Doc. No. 8, PageID 906. Petitioner acknowledges that the transcription is accurate.  Response to Return, Doc. No. 9, PageID 4001.)

## Analysis

In Ground One, Baker asserts that the warrant for his arrest was issued without probable

cause.  The First District Court of Appeals decided this issue on the merits and held:

> [*P53]  Baker first asserts that he was the titled owner of the BMW at the time the warrant was issued.
>
> [*P54]  Officer Wobser submitted an affidavit and complaint for Baker's arrest to the Hamilton County Clerk of Courts, who issued the warrant. In Ohio, clerks of court are authorized to issue an arrest warrant if the petitioning complaint or affidavit is supported by probable cause. Crim.R. 4(A)(1). The determination of probable cause is based on the averments in the complaint or affidavit. To challenge the factual averments in the complaint, the burden is on the defendant to make a preliminary showing that the affiant made false statements knowingly and intentionally or with a reckless disregard for the truth. *State v. Townsend* (Sept. 14, 1990), 4th Dist. No. 1618, 1990 Ohio App. LEXIS 4174, citing *Franks v. Delaware* (1978), 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667.
>
> [*P55]  At the suppression hearing, Baker failed to present evidence that Officer Wobser had made false statements in the petitioning complaint. And because he failed to make this showing, he has waived his right to challenge the finding of probable cause. That notwithstanding, we are convinced that the complaint alleged sufficient facts to constitute probable cause to issue the warrant; and there is no indication that Officer Wobser knowingly or intentionally made any false statement.

*State v. Baker, supra*.

Mr. Baker's First Ground for Relief is without merit for two reasons.

First of all, Baker has failed to show that the state court's decision is contrary to or an unreasonable application of clearly established Supreme Court decisions.  When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Brown v. Payton,* 544 U.S. 133, 134 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362 (2000).  This claim was plainly

decided by the Court of Appeals in deciding Baker's first assignment of error. The gravamen of the claim is that Officer Wobser lied about the ownership of the BMW is obtaining the warrant, but the Court of Appeals held that in Ohio the certificate of title is not necessarily determinative of ownership. That is a question of Ohio law on which this Court must accept the decision of the Ohio courts. Given that holding, the determination that Officer Wobser did not make "false statements knowingly and intentionally or with a reckless disregard for the truth" is a finding of fact which Baker has not shown to be based on an unreasonable determination of the facts.

The second reason why Ground One is without merit is because an unlawful arrest does not make unconstitutional a subsequent conviction for the offense on which the arrest was made. *Browning v. Jabe*, 894 F.2d 1336, 1990 U.S. App. LEXIS 1374 (6th Cir. 1990); *United States v. Crews,* 445 U.S. 463, 474 (1980); *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975); *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886).

Ground One should be dismissed.

## Ground Two

In his second Ground for Relief, Baker asserts his arrest was illegal because Officer Wobser arrested him outside the territorial jurisdiction for which she was an officer. The Court of Appeals also decided this claim on the merits as follows:

> [*P56] Baker next argues that Officer Wobser acted outside her jurisdiction when she arrested him in Warren County. But an officer may pursue and arrest a defendant in any Ohio county when that officer has an arrest warrant. R.C. 2935.02. Baker also argues that Officer Wobser failed to bring him to a magistrate or court in Hamilton County as required by R.C. 2935.02. Even if this is true, a

-4-

> violation of this section of the Revised Code does not implicate the constitutional protection afforded by the exclusionary rule. *See State v. Jones*, 121 Ohio St.3d 103, 2009 Ohio 316, 902 N.E.2d 464, P21. Baker's assignment of error alleging that the trial court erred in overruling his suppression motion is meritless.

*State v. Baker, supra.*

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. §2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*;Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62 (1991). There is nothing unconstitutional about a State's authorizing a law enforcement officer to make arrests anywhere in the State. In this case the Court of Appeals interpreted Ohio law to do precisely that and we are not permitted to second guess that interpretation of state law.

Moreover, as noted with respect to Ground One, even an unconstitutional arrest does not prevent a valid conviction on the underlying offense. Ground Two is also without merit and must be dismissed.

**Ground Three**

Respondent interprets Petitioner's Ground Three as raising a claim that his conviction is supported by insufficient evidence and Petitioner does not quarrel with this characterization; indeed, his Response is largely an argument about the credibility and interpretation of the evidence against him.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc).  In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was adopted as a matter of Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991).  Of course, it is state law which determines the elements of offenses;  but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to

> convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

In this case the First District Court of Appeals decided that there was sufficient evidence for conviction.  First of all it found the following relevant facts:

> [*P4]  Baker held himself out as a successful real-estate developer and advisor, when, in fact, he fraudulently took investors' money and used it for the unintended purposes of buying cars, flowers, and other personal items wholly unrelated to business or real estate. Baker met women on Internet dating websites where users create a profile in hopes of attracting would-be suitors. On these websites, Baker characterized himself as a successful businessman who bought and sold real estate and remodeled houses.

> [*P5]  Baker would gain the confidence of women he met on the

Internet and then would ask them for money to invest in real estate, while promising enormous returns on their investments, jobs and commissions, or long-term commitments. The evidence showed that Baker, after having built a trusting relationship, had solicited an $ 80,000 investment from Rhonda White and a $ 20,000 investment from Marcia Garrison. Baker then purchased homes for no money down in White's name, using her credit. In Garrison's case, he did nothing and kept the money.

[*P6] White could not afford the mortgage payments on the homes, and they all were foreclosed on. The money that Baker took from Garrison was never used to buy her a home or to invest in real estate. * * * * *

III. Rhonda White

[*P8] Baker met White online through a matchmaking service. White liked Baker. Baker's online profile claimed that he was a general contractor who could do anything, a Christian, and a father. He also claimed that he could help people build financial independence through real-estate investment--what a catch!

[*P9] White and Baker grew close--they would talk on the phone daily and would email each other regularly. White informed Baker that she wanted to sell her house in Florida and buy a home in Ohio. Though they had only been conversing for a week, Baker offered to facilitate the transactions, and he arranged for her Florida home to be painted and for other minor repairs to be made in preparation for the sale. Baker told White that he felt good about their relationship, and he also revealed that he had already picked out a diamond ring for the next woman he would marry. The trap was set.

[*P10] Baker told White that he invested in real estate through his company EB and Associates, which, Baker claimed, had two employees. Baker likewise offered to find a home for White in Ohio, and he then sent her the home-loan prequalification documents. It is highly unlikely that Baker could ever have been approved for these home loans--even in what was then a highly loose lending climate--because his credit was ruined, and he was on probation for passing bad checks.

[*P11] White then informed Baker that she needed a house that

-8-

could accommodate her oldest child, who has cerebral palsy. At the time, White had already become emotionally involved with Baker by virtue of their email and telephone communications, and she trusted him.

[*P12]  White testified that she had filled out the home-loan prequalification documents, and that  she had trusted Baker to help her find a home that she could afford with her limited income and periodic child-support payments. Baker then asked White to give him $ 30,000 for investment purposes, to cover closing costs and a down payment, and to help White qualify for a home. Baker told White that the investment would yield $ 20,000 to $ 25,000 per month, and that she could also work for his company, earning between $ 7,000 and $ 10,000 monthly. White was initially skeptical. But a trip to Cincinnati to see Baker would change that.

[*P13]  In July 2006, White and her children visited Cincinnati. White and Baker met, and Baker immediately put on his show. He made extravagant overtures and tried to impress White with the cars and houses that he owned. After her arrival, Baker took White to dinner, showed her homes that his company owned, and suggested that White buy one of the company-owned houses. When White questioned Baker on how she would be able to afford such an expensive house, Baker replied, "Creative financing."

[*P14]  During her stay in Cincinnati, Baker continued to woo White. He raised the possibility of marriage again. He took White and her children to a dining and recreational establishment where he gave them a significant amount of money to play games. And he continuously bragged about the success of his business, often displaying large amounts of cash.

[*P15]  On White's last day in Cincinnati, Baker took the family to church, and he finally convinced White to give him a $ 30,000 check. Again, the money was supposed to go towards a home and real-estate investment, and Baker reiterated that, after her investment, White would make between $ 7,000 and $ 10,000 a month in salary.

[*P16]  Baker then began to steer White toward a particular home that he owned. She did not care for it because it was not appropriate

for her disabled child, and because it was too expensive. But Baker again told White that she could afford the home through both "creative financing" and her job with his company.

[*P17]  After White returned to Florida, Baker informed her that he had found another house for her, and he sent her pictures of the home. White liked it, and Baker arranged for all of the loan documents to be gathered and completed. Baker sent the documents to White, and she filled in the blanks and signed them. White then wrote a letter, on Baker's instructions, to the mortgage broker, stating that her monthly income was $ 7,827, which reflected not her actual income but the income Baker had represented that his company would pay her. White did not tell the broker that she was not earning that much money quite yet.

[*P18]  White bought the house for $ 375,000, with no money down. Baker attended the closing and reviewed the documents as White blithely signed each one. None of the $ 30,000 was used to purchase the home. The monthly payment was $ 2,500, and White believed that she would be able to afford this payment when she began to earn her monthly income from Baker's company.

[*P19]  At this point, all was well. Baker and White seemingly had a good relationship, and Baker continued to assure White that she had made a good purchase and that money was forthcoming. Baker continued his marriage talk, along with a proposition that White buy another, larger house.

[*P20]  White quickly sold her Florida home for a profit of $ 63,000. Baker immediately asked for another $ 50,000 for investment purposes. White agreed and wrote a check to EB and Associates. White testified that she had given Baker the money because she had loved and trusted him.

[*P21]  From late 2006 to early 2007, Baker gave White a few thousand dollars, and  he also made a small contribution to White's January mortgage payment. White continued to ask when she would get paid, telling Baker that she needed money. She got none. Instead, Baker told White that he needed more money to invest, but White was cashed out. In fact, she had to remove her children from a private

-10-

school because she could not pay the tuition. Baker did do some household repairs, but nothing of substance And when White again asked about her monthly income, Baker blamed others and said that some real-estate deals had fallen through, and that money was forthcoming. Baker would tell the same tale of "impending deals" to others as well.

[*P22] Around the time that White was asking Baker for money and help, Baker asked White to use her credit to buy another house in Florida. Baker told White that she could buy the house, make money on the purchase by renting the house, and then later resell it for a profit. He also said that the income from the Florida purchase would help pay for her Ohio home. On these inducements, White bought a Florida home for $ 345,000. One of the documents indicated that White had paid $ 14,904.09 in closing costs, but White testified that she had not actually paid any money.

[*P23] In late January, White had not been paid, nor had she made a dime on any "investment," and her trust in Baker waned. Despite her diminished faith, White agreed to purchase yet another home in Florida. Baker assured White that this home would be a surefire deal, and that he could quickly resell the home at a substantial profit. White purchased this home for $ 680,000, and once again Baker negotiated the deal, and White blithely signed the documents. One document indicated that White had paid $ 50,223.76 at closing, but White testified that she had neither brought money to the closing nor made a down payment on the home.

[*P24] In early February, Baker continued to assure White that the three home purchases would yield a profit. But later that month, the house of cards crashed down when a mortgage broker telephoned White and told her that Baker would not be paying the mortgages on any of the three properties and asked her how she would make the monthly payments. Around that time, White realized that she had been taken, and she also learned that Baker was married. White then contacted the police and told her story.

[*P25] At the time of trial, all three houses either had been foreclosed on or were in the process of foreclosure. White testified that Baker had taken her money and used it to buy and repair a car for

-11-

himself and to buy cars and flowers for other women "investors." Baker had borne no risk on any of the loans, and the risk of default and failure had fallen squarely on White.

[*P26] A later investigation revealed that Baker had used White's $ 30,000 check as an initial deposit to open a business checking account. The account was opened in late July, and 30 days later, there was a balance of $ 18.88. A short time later, the account was overdrawn.


IV. Marcia Garrison

[*P27] Marcia Garrison owns a private school licensed by the state of Ohio. Though she owns the school, she receives very little income, other than a monthly $ 1,000 social-security benefit that accrued at the death of her husband.


[*P28] Garrison lived in a condominium in Cincinnati. She had the unfortunate occasion to meet Baker through her friend Melissa Rogers, who also happened to be a girlfriend of the married Baker. Though Baker was married, he was living with Rogers and their two children at that time. On meeting Garrison, Baker told her that he remodeled houses for a living. Later, Baker moved out of Rogers's condominium, but he would often return to visit his children. On one such occasion, Baker struck up a conversation with Garrison. He told her that his business was thriving, and that he was earning over a million dollars a year. Garrison told Baker that she wanted to buy a ranch house so that she could accommodate both herself and her aunt.


[*P29] Baker told Garrison that he could get her an acceptable house if she gave him $ 50,000. Garrison did not have that much money, but she was able to get $ 20,000 as a gift from her aunt, which she then gave to Baker in two $ 10,000 cashier's checks. Baker and Garrison agreed that, in exchange for the $ 20,000, Baker would get Garrison a ranch home, and that she would (somehow) have $ 5,000 per month in income from the house, half of which would be used to pay the mortgage, and the remainder of which would go to Garrison as income. Baker agreed that the arrangement would last for 48 months, at which time the house would be paid off. At that point, Garrison could either continue the arrangement or get her $ 20,000 investment back.

-12-

[*P30]  Before Garrison gave Baker the $ 20,000, she insisted that the agreement be memorialized in writing. Baker drafted an agreement acknowledging that he had received a $ 20,000 "loan" on October 13, 2006, and that it was payable in 60 days in the amount of $ 30,000.

[*P31]  Garrison was not pleased with the language in Baker's contract because she believed the money was for a house and was not a loan. The two finally agreed on language that indicated that, in exchange for the money, "EB and Associates, Ernie Baker, will have a house for [Garrison] to move into respectfully [sic]. [And the] contract can be extended for the purpose [sic] of a home for at least 48 months for the purpose of paying off the home at the rate of $ 2,500 per month."

[*P32]  We are unsure what the terms of the Baker/Garrison agreement were. But we are sure that Garrison did not get a house, and that she did not get her money back. Instead of investing the money, Baker immediately shifted the funds and used the money to buy a Jeep Liberty for someone else.

V. The BMW Theft and a Forged Check

[*P33]  In November 2006, Baker bought a 2003 Land Rover. Baker gave the BMW Store a company check from EB and Associates, but he asked the dealership to hold it for a week. The account the check was drawn on was closed, but Baker, of course, did not tell the BMW Store. Baker said that he would exchange the check for a cashier's check a few days later, when a real-estate deal was supposed to be completed.

[*P34]  The BMW Store allowed Baker to drive away in the Land Rover in exchange for the check. The BMW Store's representative testified that, because Baker was a well-spoken "businessman" from Indian Hill (a very ritzy residential area), and because he had given the BMW Store a check that (the dealership thought) later would be good, he was allowed to take immediate possession of the Land Rover.

[*P35]  After the BMW Store had contacted Baker multiple times

about paying for the Land Rover, Baker finally came in, apologized, and paid. On that day, Baker purchased a BMW convertible, and on the next day, he returned and bought a Chevrolet Silverado pickup--he said that he wanted to buy the BMW for a friend and to buy the Silverado to replace an older truck that had been used to drive to job sites. To make these purchases, Baker began by apologizing profusely for the delay in paying for the Land Rover, and he then promised to pay for the BMW and the Silverado in a more timely fashion. Again Baker gave the BMW Store company checks from EB and Associates and asked that they be held for a few days. And again he was allowed to take immediate possession of the vehicles. And again Baker did not pay on time--or ever.

[*P36] Weeks passed, and Baker had not paid the BMW Store. Baker apologized for the delay and told the BMW Store that he would sell stock to get the money, and the dealership gave him more time to pay.

[*P37] Meanwhile, still owing for the previous two vehicles, Baker bought yet another car from the BMW Store--a 1995 Honda Accord that he purchased for another friend. This car was old and relatively cheap, and had many miles on it. Evidently catching the looneyness of the real-estate market, the BMW Store allowed Baker once again to take immediate possession without payment. And yet again, Baker did not pay.

[*P38] With the BMW, the Silverado, and the Accord payments still owed by Baker, the BMW Store began trying to collect on his account. Phone calls went unreturned, and when contact with Baker was made, he lied to, manipulated, and deceived the dealership time and time again. Finally, Baker claimed that he was closing on property and would have the money soon. Evidently the deal fell through, but Baker told the dealership to cash the company checks that he had originally told the dealership to hold and indicated that the funds were available. But when the dealership tried to cash the checks, it learned that the account had been closed the entire time.

[*P39] These checks were written on a business account that had been opened at JP Morgan Chase in May 2006. Baker had Carla Clark, one of his "employees" (who was also romantically involved with Baker), open the account under the name EB and Associates,

Inc., and Clark was the authorized signer on the account. Baker did not want to open the account or to be a signer because he was on probation for passing bad checks. And Clark insisted that she be the only signer on the account because Baker had previously overdrawn their joint account at U.S. Bank, and she did not want her credit further ruined by Baker overdrawing on the JP Morgan Chase account.

 [*P40]   In June 2006, the account was changed to EB and Associates, LLC, and Clark was still the signer on the account. When Baker gave the BMW Store the checks for the BMW and the Silverado, Clark was still the sole signer on the account, and she testified that she had never signed those checks. Baker had forged her signature.

 [*P41]  Baker never paid for the vehicles, but the Silverado was returned to the BMW Store's lot. Later, the dealership was contacted by a woman living in Canada named Mary Jean Emery, who, not coincidentally, had also "invested" with Baker. Emery told the BMW Store that she had received the BMW as a gift from Baker, and that she had the title to the vehicle, even though the original title was still in the accounting office of the dealership because Baker had never paid for the vehicle. The BMW was also eventually returned to the dealership.

VI. Tampering With Records

 [*P42]  Later investigations revealed that the title to the BMW that Emery said she had possessed was, in fact, a duplicate title. A duplicate is issued in Ohio only when the original has been lost, stolen, or destroyed, and it cancels out the original title.

 [*P43]  The BMW Store, in anticipation of Baker's payment, and to help facilitate a quick transaction, changed the original title to reflect that Baker was the owner, but Baker never had physical possession of this original title--the dealership possessed it the entire time.

 [*P44]  In January 2007, Baker went to the Hamilton County Clerk of Court and signed a form swearing that the title to the BMW had been lost, even though it had not. The duplicate title was later canceled.

-15-

*State v. Baker, supra*.  The Court of Appeals then analyzed this evidence in light of Baker's claim

that his conviction was against the weight of the evidence and based on insufficient evidence.

> XI. Sufficiency and Weight of the Evidence

> [*P59]  In case number B-0701835, Baker was charged with five
> counts of theft, 15 one count of forgery, 16 and one count of passing
> a bad check. 17 Specifically, Baker was charged with two counts of
> theft against White, one count of theft against Garrison, one count of
> theft against the BMW Store, and one count of theft against Terrilynn
> Knight, who had been unfortunate enough to have coincidentally met
> Baker and given him $ 9,000 to "fix her credit rating" (whatever that
> means), at Baker's suggestion, through underhanded means. He was
> convicted on four theft counts and was acquitted of the theft from
> Knight. The forgery count was based on Baker's unauthorized
> signature on the check given to the BMW Store for the BMW, and
> the bad-check count was for the postdated check that he had given the
> florist--and he was convicted of both.

> [*P60]  In case number B-0706253, Baker was indicted for two
> counts of theft. 18 One involved Sarah Littleton, another girlfriend of
> Baker's and, later, a mother of his child, whom he had met through a
> dating website, and to whom he had given the Honda Accord only
> after she had given him money for the vehicle. The other theft charge
> included the BMW Store and concerned the Honda Accord (the
> fourth vehicle they let him have), and the jury acquitted him of both
> counts of theft. Baker was also indicted for forging 19 another check,
> this one made payable to the BMW Store for the Honda Accord and
> for tampering with records 20 for illegitimately obtaining a duplicate
> title for the BMW. He was acquitted on the forgery charge, but was
> found guilty of tampering with records.

> [*P61] Baker challenges the weight and sufficiency of the evidence
> used to convict him. HN6When reviewing the sufficiency of the
> evidence to support a criminal conviction, we must examine the
> evidence admitted at trial in the light most favorable to the state. We
> must then determine whether that evidence could have convinced any
> rational trier of fact that the essential elements of the crime had been

proved beyond a reasonable doubt.

[*P62] A review of the weight of the evidence puts the appellate court in the role of a "thirteenth juror." We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.

## XII. Thefts from White and Garrison

[*P63] We reject Baker's sufficiency and weight claims concerning the thefts from White and Garrison. The record is replete with evidence to support the charges. The record overwhelmingly shows that Baker obtained money from both White and Garrison by deception.

[*P64] Baker also contends that the state failed to show that he had no intention to repay the money or to perform under the contracts. In this respect, Baker could not have had the requisite intent to repay the money or to perform because there was no reasonable expectation that he would make any legitimate money: Baker regularly and systematically deceived people to obtain money, and made outlandish promises that he could not have reasonably expected to fulfill. As far as we can tell, Baker never made a legitimate dollar from any of these transactions; and he cannot have reasonably intended to repay when the money he had been using to pay off creditors had been conned from others. Baker had basically been paying Paul by conning Peter.

[*P65] The evidence also showed that Baker had obtained the BMW from the BMW Store through deception; but Baker argues that he could not have been convicted of theft when the title to the vehicle was in his name. We are not convinced. Baker obtained the vehicle and the later "lost"-title certificate through deception. The BMW Store never transferred physical possession of the title to Baker; it held onto the title pending payment. A certificate of title is not necessarily determinative of ownership of a motor vehicle. 25 Baker never owned the BMW; the BMW Store did. Baker deceived the dealership by giving it bad checks that had been written on closed accounts: writing a check on an account one knows to be closed is evidence of intent to deceive. 26 The evidence supported the jury's finding that Baker had obtained the BMW by deception as prohibited

by R.C. 2913.02.

[*P66]  The evidence likewise supported his conviction for forging the check that he gave to the BMW Store. The signer testified that, though her name appeared on the check, the signature was not hers.

XIV. Tampering

[*P68]  We affirm Baker's tampering-with-records conviction. The evidence showed that Baker had signed a form swearing that the original title to the BMW had been lost, when he knew that it had not been lost. He knew that he had not paid, and he needed a title to impress yet another "investor." He tampered with records, and the conviction was proper.

*State v. Baker, supra*, footnotes omitted.  This decision is neither contrary to nor an objectively unreasonable application of clearly established Supreme Court precedent.  The authority cited by the Court of Appeals is either directly from the Supreme Court (*Tibbs*) or Ohio Supreme Court precedent embodying the *Jackson v. Virginia* standard (*Thompkins, Jenks*).  The Return of Writ cites extensively to transcript pages of testimony supporting the Court of Appeals opinion.  It is proper for this Court to defer to the decision of the First District Court of Appeals and dismiss the Third Ground for Relief.

**Ground Four**

In Ground Four, Baker asserts that the charges against him were unconstitutionally joined for trial.  The Court of Appeals also decided this claim on the merits as follows:

-18-

VIII. Joinder

II. It's All in the Details--A Case for Joinder

[*P7] Baker first argues that the trial court improperly joined the criminal cases into one trial. He argues that he was prejudiced by the joinder of the two cases, and that the court should have held separate trials for each case. Not so. The charges in both cases were inextricably related, and the facts showed a common course of criminal conduct– Baker had essentially stolen from White and Garrison to pay his creditors.

[*P50] Baker first argues that these cases were prejudicially joined for trial. Generally, if the charged offenses are of the same or similar character, are based on two or more transactions connected together, or are parts of a common scheme or course of criminal conduct, then the offenses can be joined for trial. See Crim.R. 8(A); *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476.  Joinder of charges is preferred because it facilitates judicial economy, consistent results, and witness convenience. *See State v. Webster*, 1st Dist. Nos. C-070027 and C-070028, 2008 Ohio 1636, P31, *citing State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293; *State v. Brotherton,* 1st Dist. Nos. C-050121 and C-050122, 2006 Ohio 1747, P17, *citing State v. Thomas* (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401.

[*P51] We note the intricate web in which Baker weaved his cons. The basic scheme involved Baker's stealing, under the guise of "investment," from various women to pay his own debts, which were wholly unrelated to the purpose for which the money was supposed to be used. Baker stole from women through a common investment scheme that had often been proposed after a romantic or emotional relationship had evolved; and he then spent the money on himself or sometimes other women. We also note that Baker's scheme was to hold himself out as a  businessman who had been very successful in his real-estate investments. The record is replete with common criminal activity that closely linked each case, and the cases were properly joined. And we further note that the jury obviously followed all the evidence of the different charges, acquitting Baker of several of them. We overrule Baker's first assignment of error.

*State v. Baker, supra.*

Respondent asserts this claim is procedurally defaulted because Baker failed to present it to

the Ohio Supreme Court.      The procedural default defense in habeas corpus is described by the

Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his
>
> federal claims in state court pursuant to an adequate
>
> and independent state procedural rule, federal habeas
>
> review of the claims is barred unless the prisoner can
>
> demonstrate cause of the default and actual prejudice
>
> as a result of the alleged violation of federal law; or
>
> demonstrate that failure to consider the claims will
>
> result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones,* 238 F. 3d 399, 406 (6th

Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he

could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977);

*Engle v. Isaac*, 456 U.S. 107 (1982).  Absent cause and prejudice, a federal habeas petitioner who

fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.

*Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986);

*Engle v. Isaac*, 456 U.S. 107 (1982);  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  *Wainwright*

replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and

prejudice standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977).  *Murray v. Carrier*, 477 U.S. 478,

485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).  Failure to present an issue to the state supreme court on discretionary review constitutes procedural default.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  "Even if the state court failed to reject a claim on a procedural ground, the petitioner is also in procedural default 'by failing to raise a claim in state court, and pursue that claim through the state's ordinary appellate procedures.'" *Thompson v. Bell*, 580 F.3d 423 (6th Cir. 2009), citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

An examination of the issues presented on appeal to the Ohio Supreme Court shows that prejudicial joinder is not among them.  Baker has offered no excusing cause and prejudice. Therefore his Fourth Ground for Relief should be dismissed.

## Conclusion

On the basis for the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied any requested certificate of appealability and leave to appeal *in forma pauperis*.

October 4, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

-21-

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

J:\Documents\Baker Habeas R&R.wpd